**Receipt number AUSFCC-6293019**

United States Court of Federal Claims
Washington DC

_____
                                              )
David Paschane, Aplin LLC, Aplin Labs,)
           Plaintiffs                         )
                                              )        No.   **20-824C**
       v.                                     )
                                              )
Robert Wilkie; United States Dept.  )
of Veterans Affairs,                     )
           Defendants                    )
_____)

## COMPLAINT

Comes now the Plaintiff, alleging Breach of Contract, Theft of Intellectual Property, and Conversion of Property, in this Complaint as follows:

## THE PARTIES

1. David Paschane, Ph.D., is a U.S. Veteran who offered assistance to the U.S. Department of Veterans Affairs, especially in regard to updating their automated processing systems, particularly through PASS technology.

2. Aplin LLC and Aplin Labs are each separately incorporated corporations owned and operated by Paschane to develop and provide such PASS technology.

3. Robert Wilkie is the Secretary of the U.S. Department of Veterans Affairs.

4. The U.S. Department of Veterans Affairs (hereinafter "VA"), is a federal agency devoted to serving Veterans, particularly by providing Veterans benefits and healthcare earned by veterans through their service to the United States military.

1

## JURISDICTION

5. Jurisdiction in this matter arises under 28 U.S.C. Sect. 1491 (a)(1).

## ALLEGATIONS OF FACT

6. VA executives hired a Veteran owned small company by contract to fix their outdated accounting automation. The contract specified the use of PASS technology, which was well known in VA because of praise regarding PASS in *Computerworld* magazine (Exhibit 1).

7. A small Alaskan company, owned and operated by Paschane, Aplin Labs, created PASS in 1994, using its processing to improve health care, for which VA was receiving heavy scrutiny and criticism for slow care and long wait times.

8. Paschane is an Army medic veteran who started Aplin Labs, a research and development company, in 1994. Aplin is best known for an applied research-based technology called Performance Architectural Science Systems, or PASS.

9. After completing his doctorate and receiving a Presidential Management Fellowship, Paschane decided to pause Aplin Labs and work for the U.S. Department of Veterans Affairs (VA). While at VA, he used PASS designs to help VA executives lead fundamental reforms. Paschane's PASS work was officially recorded as his own in the federal record, at VA119A13RO134 (Exhibit 2). In 2013, Paschane's PASS-based innovation at VA was reported in *Computerworld* magazine as a means of reducing VA bureaucracy.

10. When the PASS technology demonstrated remarkable improvements in VA processes, one of the VA executives attempted to steal a copy while he was under investigation for abusing his authority (Exhibit 3).

11. Eventually, the full PASS technologies demonstrated a forty times improvement in processing capabilities at the VA (Exhibit 4, page 5).

12. Rather than simply license the PASS technology from the Veteran's software company, VA executives stole a test copy that was being tested on their servers, cancelled the licensing process, terminated the Veteran's company, and refused to pay the outstanding bill for processing services, $412,500.

13. Meanwhile, VA executives repeatedly reported the process cost savings of the PASS technology as ultimately totaling $43 million (Exhibit 5, Exhibit 6). Yet, they lied to a Congressman who asked about how they acquired the cost saving software technology (Exhibit 7).

14. The Veteran hired lawyers to challenge the VA in federal court, but the company's lawyers, Offit Kurman, misrepresented their ability to challenge the VA and used the case to quadruple their quoted charges.

15. The bottom line is that when a Veteran's company tried to fix the VA's problems, the old guard stole their software and refused to pay for the services of the Veteran and his companies.

16. In 2012, VA was under Congressional review for fraudulent spending on travel and conferences, resulting in an OIG report and Congressional accountability specific to the VA (P.L. 112-154, Sec. 517), and then all agencies in six more laws (Exhibit 8).

17. In the same *Computerworld* article about Paschane's work, a VA senior executive, Volney Jim Warner (hereinafter "Warner"), was interviewed, and he reported that he was pursuing PASS technology to resolve VA's conference spending problem (Exhibit 1). That spending problem resulted because 80% of its cases needed to be reworked because of employee errors (Exhibit 5), its use of poorly organized data systems, and its long process causing cancellation of critical doctor training, to the detriment of the quality of health care for Veterans.

18. Seeing what PASS technology designs had accomplished in other offices, Warner sponsored a PASS-based project within the VA to assess and redesign accountability over conference spending. He noted his intention was to eventually pursue an enterprise wide solution based specifically on principles used in PASS technology (Exhibit 9). A prime contractor, Morgan 6,

established a limited use agreement with Aplin Labs to use PASS technology within their process design services for the VA (Exhibit 10). Morgan 6 established a subcontract agreement with Aplin LLC (Exhibit 11) to provide expert assessment, design, and testing based on PASS technologies. Aplin LLC was formed in 2013 to separate its government services from Aplin Labs' research and development.

19. Through the PASS project, Paschane demonstrated to Warner and his team how they could use their previously licensed software, such as Microsoft tools, to mimic some of the capabilities of PASS technology. The Morgan 6 subcontract only allowed for prototyping, not the direct acquisition of PASS technology as an operational system.

20. When a prototype of PASS technology, called EMAP by VA, proved effective to VA leadership (Exhibit 12) and the VA OIG (Exhibit 13), and Aplin Labs demonstrated that the full PASS technology could perform four times better than the prototype, Warner and his Deputy Manny Dominguez, excitedly promoted themselves as solving the VA's conference spending problem. Warner even submitted a memo to the rest of VA letting them know that he was going to offer them conference planning and reporting to Congress as an internal service, where his office would charge other offices for his support (Exhibit 14).

21. During a PASS project review (Exhibit 15), Dominguez was reminded that VA did not yet have a license to use EMAP (PASS technology), now called EMAP 2.0 to distinguish it from the prototypes. Dominguez was caught writing in an email to his employees his intent to steal PASS technology (Exhibit 3). Aplin Labs reported the email to the OIG, but there was no response.

22. Dominguez, who threatened to steal PASS technologies, was removed from his position (Exhibit 16) for what was likely to be software theft and conversion, which was internally reported by employees as an OIG investigation worth $11 million in losses. But the investigation and removal did not become a public report.

23. The PASS technologies revealed that VA was under-reporting events that were estimated to cost over $100 million to Congress, and employees

attempted to use cruise ships or other "unaccustomed locations" 800 times for training (Exhibit 17). Another internally reported investigation that was unpublished was that the previous Secretary was caught using travel for an extramarital affair, for which the President removed him from office. To this day, OIG reports that its conference travel is compliant with federal laws, and that its 2020 budget request before Congress suggests they are using VA resources to save money on such events, a capability that is due to the use of EMAP, stolen from Paschane.

24. After Dominguez left VA, Warner decided he was ready to make the PASS technology, which was designated as EMAP, the enterprise-wide tool for managing and reporting conferences. In support of the average of 12,000 Department training events a year, the PASS technology, EMAP, demonstrated that it could reduce rework from 80% to zero, and reduce the average 40-hour case time for such work to less than one hour (Exhibit 4, Exhibit 5, Exhibit 6).

25. During the contract formation with Aplin LLC, VA presented a plan to do minimal updates to current policy-required data formats, through an EMAP installation for $250,000, and reported that they would complete the software license through the VA IT office. After a lengthy contract formation process, at the time to sign the contract, VA employees changed hard to find contract language without disclosure, which created significant material impacts, and kept the contract under dispute.

26. With the understanding that VA would resolve the contract, license the PASS software, and pay for its required software requests, Aplin LLC complied with the contract, despite the disputed language. Without disclosure to Aplin LLC, Warner's team was notified that the contract officer had left the VA. In actions affirmatively misleading Aplin LLC, Warner's team continued to make software modification requests and delayed the software license as if they were representing the contracting officer, who was not present for 7 months (Exhibit 18, Exhibit 19). In further affirmative misrepresentation, although a VA IT employee (Prince Reynolds) contacted Aplin LLC about processing the PASS technology license (Exhibit 20), he left VA, and Warner's staff actively prevented the license from being completed (Exhibit 21). Paschane reported

this suspicious conduct to an overseeing VA official (Paula Molloy), who took some action (Exhibit 22), but she also left the VA.

27. Aplin Labs then took the total contract dispute to members of Congress. Congressman Hultgren wrote VA about the case but did not receive a response before leaving office (Exhibit 23). Congressman Foster's staff confirmed by email that Warner knew that the PASS technology is written in an uncommon programming language, and that he was offering to provide it to other agencies at no cost, which would have been illegal (Exhibit 7). The VA provided a poorly written response about the disputed contract to Foster's office, in which the VA manager fraudulently claimed that he "made the algorithms" of the PASS technology (Exhibit 24). The uncommon language is *Go*, and it required special approval from the VA IT office to allow it to be added to their servers (Exhibit 25).

28. After VA accepted PASS technology as their enterprise operating system (Exhibit 26), but did not complete the software license, Aplin Labs called on VA leaders to complete the technology license and pay for finished services (Exhibit 27, Exhibit 28). VA refused to cooperate and attempted to abuse the disputed contract again, so Aplin Labs reported the contract misrepresentation in the official federal Contractor Performance Assessment Report (Exhibit 29). During this time, Aplin LLC quickly provided all required services in an optional contract period.

29. Soon thereafter, VA terminated the contract on fraudulent claims (Exhibit 30), which were refuted, with evidence, by Paschane (Exhibit 31).

30. When VA terminated Aplin LLC, they refused to pay for the completed services under the contract, a bill of $412,500, though all services were provided, and in excess of requirements. The total out of scope work, detailed in time sheets, was $1,194,211.50 (Exhibit 32, page 31). At the time, the market cost of using Aplin Labs' PASS technology, EMAP, is $50 per user, per year. The EMAP 2.0 software is a robust, online enterprise copy that stores user access for every VA office and employee. With at least 1,532,243 employee-years with EMAP access since April 2017, the total cost is $76,612,150.

31. On October 12, 2016, VA manager Chris Nelson, working for Warner, submitted an internal VA request for funds, estimating that PASS technology saved VA $13 million Exhibit 5). In another document, another VA manager under Warner explained that subsequent annual cost savings equaled $7 million (Exhibit 6), which defined the total cost savings to date as $43 million.

32. VA Deputy Director Manny Dominguez stole the PASS technology from Paschane, which has enabled Dominguez to market software products built on PASS to a broad customer base especially during the Coronavirus Pandemic, with many professionals forced to work quarantined from their homes. The exact full extent of those profits stolen from Paschane will be further determined in discovery, but Paschane now estimates they will total at least $5 million.

33. PASS provides the ability to manage employees work remotely, organizing tasks to allow for automatic tracking of work by employees without causing them anxiety about being watched. This would have been a huge help with telework and telemedicine needs in the US especially now with the quarantines and stay at home orders stemming from the COVID-19 global Pandemic.

34. Major health systems, like VA, are at high risk for losses and failures unless they track such major health incidents, and focus their training dollars on mitigating each one explicitly, with follow-up to track the real effects. This is exactly what PASS software does, especially with the Training Value Indicator (TVI), which Paschane added into the EMAP 2.0 version that VA uses. TVI also has its own major value proposition in the market, which was also stolen from Paschane, depriving him of a record of success that he could have used to market his software further in the market. Indeed, TVI added to the benefit to VA of its intellectual property theft. Both that benefit and the added value to Paschane of marketing that benefit of his software is conservatively valued at another $10 million.

35. Furthermore, all agencies of the federal government have the same requirements that the VA does to monitor and track expenses. Plaintiffs arranged a meeting with the Treasury Department to submit a proposal for full servicing throughout the U.S. government with PASS technology,

7

covering at least 2 million more users. With a licensing fee of $50 per user per year, that resulted in another loss to Plaintiffs of more than $76,612,150.

36. Plaintiffs also sought to license their PASS technology to China, to monitor and track the training, conferencing, telework, and telemedicine costs of that nation's major health system costs for the people of that nation. VA's abuse of veteran Paschane and theft of his intellectual property, which would have validated the value of the PASS technology, resulted in a further loss to Plaintiffs of at least another $76,612,150.

### First Cause of Action – Breach of Contract

37. All of the 36 allegations above through Paragraph 36 are fully reincorporated herein as if completely restated.

38. VA entered into a contract and subcontract with Aplin LLC, and Aplin Labs, both owned by Paschane, for use of its PASS technology, to control the VA's costs for travel, conferences, training, and to improve timely health care services for veterans. This technology provided multiple millions in savings for the VA, enabled the VA to comply with applicable law, and resulted in better health care with fewer delays for veterans. Yet, VA has refused to provide payment due under those contracts.

39. Consequently, VA is liable for all damages to Paschane, Aplin LLC, and Aplin Labs for such Breach of Contract.

### Second Cause of Action – Theft of Intellectual Property

40. All of the 39 allegations above through Paragraph 39 are fully reincorporated herein as if completely restated.

41. VA officials stated their intent to steal PASS technology from Paschane, Aplin LLC, and Aplin Labs. They discussed licensing of PASS technology with all three Plaintiffs, but failed to carry out any such licensing. They discussed further contracts with Paschane, Aplin LLC, and Aplin Labs, but failed to enter into those contracts. Plus, VA officials were dismissed for engaging in such theft of intellectual property. As a result, VA benefitted from use of

PASS technology in different formats, from prototypes to direct use of the technology, for years, resulting in benefits of such use worth millions.

42. Consequently, VA is liable to Paschane, Aplin LLC, and Aplin Labs for Theft of Intellectual Property, and all resulting damages from such theft.

Third Cause of Action – Misrepresentation and Conversion

43. All of the 42 allegations above through Paragraph 42 are fully reincorporated herein as if completely restated.

44. VA discussed further contracting with Aplin LLC and Aplin Labs, and licensing of PASS technology, without any intent to carry out such contracting or licensing, as evidenced by VA never informing Aplin LLC and Aplin Labs that officials previously engaged in such contracting and licensing discussions had left the VA. Plus VA falsely cancelled contracts already engaged with Aplin LLC and Aplin Labs. Plus, VA officials were dismissed for engaging in intellectual property misrepresentation.

45. Paschane, Aplin LLC and Aplin Labs relied on this fraudulent conduct of the VA.

46. Consequently, VA is liable to Paschane, Aplin LLC, and Aplin Labs for all damages resulting from such contracting, licensing, and intellectual property misrepresentation and conversion.

WHEREFORE, Plaintiffs Paschane, Aplin LLC, and Aplin Labs respectfully request this court to award Plaintiffs damages of $289,446,161.50, plus $3 million in punitive damages, for a total of $292,446,161.50, plus all costs of this action.

Date: July 8, 2020

*Peter Ferrara*

_____

9

Peter J. Ferrara  
Attorney at Law  
DC Bar No. 383128  
21132 Boston Terrace  
Suite 203  
Sterling, VA 20166  
peter.ferrara@peterferraralaw.com  
703-546-6814